Plunkard *vs.* State.

(Decided 22nd June, 1887.)

---

PIUS J. PLUNKARD *vs.* THE STATE OF MARYLAND.

*Constitutional law—Fourteenth Amendment—Bastardy.*

The Maryland bastardy law, as embodied in the Code of 1860, provides that any magistrate upon receiving information that "any *white* woman" has given birth to an illegitimate child, "may issue his warrant" for her apprehension, and when she is brought before him, "require her to give security to indemnify the county from any charge that may accrue by means of such child, and upon neglect or refusal, shall commit her to the custody of the sheriff of the county, to be by him kept until she shall give such security;" but if she discloses on oath the father of the child, then it is made the duty of the magistrate " to discharge her, and to cause the father to be arrested, and to give security to indemnify the county from all charges that may arise for the maintenance of the child." It also provides that every constable having knowledge of " any *white* woman having an illegitimate child, shall give information thereof to some justice of the peace of the county; and that the person

Plunkard *vs.* State.

charged as being the father may be proceeded against as in other criminal cases, and may be sentenced to give security, or, in default thereof, be committed to custody, &c. On the prosecution of a person for being the father of an illegitimate child of a white woman, it was HELD:

That said law was constitutional and valid, and not in conflict with the fourteenth amendment to the Constitution of the United States, and could be enforced.

APPEAL as upon Writ of Error, from the Circuit Court for Frederick County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, and BRYAN, J., for the appellee, and submitted on brief for the appellant.

*John E. R. Wood,* and *John C. Motter,* for the appellant.

*Frank C. Norwood, State's Attorney for Frederick County,* and *Charles B. Roberts, Attorney General,* for the appellee.

MILLER, J., delivered the opinion of the Court.

The plaintiff in error was indicted under the "Bastardy Law." The indictment does not describe him as a *white* man or as a *colored* man, nor does the law require such description. It does charge, however, in accordance with the law, that the woman upon whom the child was begotten was a "*white* woman." He demurred to the indictment and his demurrer was overruled. He then pleaded *non cul.* and submitted his case to the Court for trial. Upon the trial, the Court found him "guilty," and ordered him to give security in the sum of $80, to indemnify the county from any charges that may accrue for the maintenance of the child. He refused to give such se-

curity and the Court thereupon sentenced and committed him to the custody of the sheriff, and to be confined in such custody *for the period of six months;* unless he sooner comply with said order. . He then filed his petition asking for the transmission of the record to this Court as upon writ of error, and the order for transmission was accordingly passed. In his petition he alleges as ground of error the overruling of his demurrer to the indictment and alleges that the question of law raised by that demurrer, is that the Bastardy Act, by reason of the adoption of the fourteenth Amendment to the Constitution of the United States, is made unconstitutional and void.

A technical objection has been raised to the sufficiency of this assignment of error, under our rules regulating appeals. It is said the petition does not "plainly designate" the points or questions of law by the decision of which the plaintiff in error feels himself aggrieved. It alleges, however, that the demurrer raises the question of the validity of the "Bastardy Law," in view of the Fourteenth Amendment, and even if there were more force in the objection than there is, we should deem it our duty, under the averments of this petition, to meet and decide a question which has been decided in different ways by some of the Circuit Courts, and which, to a considerable extent, has been a subject of popular comment and discussion. We shall therefore proceed to give our views upon the subject; premising that our individual opinions, as to the wisdom or policy of such legislation at the present day, and in the changed conditions of the country, have nothing to do with the question. We are not legislators. Our duty and province is confined to the decision of a purely legal question, and we must decide it judicially, and with the same application of the judicial mind as if the validity of any other statute was in question.

The Bastardy Law, as embodied in our Code of 1860, has, in all its substantial features, been the law of the

State from very early times.   Without going back to Col-
onial legislation upon the subject we confine ourselves to
statutes passed since the Revolution.   In these the only
changes that need be noticed, are those in reference to the
*mother* of the illegitimate.  In the Act of 1781, ch. 13, she
is described as "any female person;" in that of 1785, ch.
47, as "any free woman;" while in the Code she is de-
signated as "any white woman."   Now, what is the law
as it stands?   It provides that any magistrate, upon re-
ceiving information that "any white woman" has given
birth to an illegitimate child, "may issue his warrant" for
her apprehension, and when she is brought before him,
"require her to give security to indemnify the county
from any charge that may accrue by means of such child,
and upon neglect or refusal shall commit her to the cus-
tody of the sheriff of the county, to be by him kept until
she shall give such security."   But if she discloses on
oath the *father* of the child, then it is made the duty of
the magistrate "to *discharge her*," and to cause the *father* to
be arrested and "to give security in the sum of $80 to in-
demnify the county from all charges that may arise for
the maintenance of the child."   By another section, every
constable who may have knowledge of "any white woman"
having an illegitimate child, is required "to give informa-
tion thereof to some justice of the peace of the county."
Then "any person" charged with being the father, may,
if he feels aggrieved by the judgment of the justice, enter
into recognizance for his appearance to the next Circuit
Court for the county, or the Criminal Court of Baltimore
if he lives in that city; and the Court is required to "take
cognizance thereof, and such proceedings shall be there-
upon had as in *other criminal cases.*"   If he is found
*guilty* of being the father, the only sentence the Court can
pass, and the only punishment it can inflict, is to require
him to give the same security which the mother is re-
quired to give in case she fails to disclose the father, and

to subject him to the same confinement in case of neglect or refusal, except that the confinement shall not be longer than twelve nor less than six months.    Act of 1880, ch. 33.    Then there is a provision applicable to the case where the father has given the security which the law demands.    In such case any justice of the peace is authorized and required "upon application of the mother, or of any person to whose custody such child may have been committed to be maintained, verified by the oath of such mother or other person that he or she has not received from the father of such child, or either 'of his securities, more than credit given, issue an order requiring such father, his security, or securities, to pay the mother, or other person having the custody of said child, such a sum of money as may appear adequate for the maintenance of such child, not exceeding thirty dollars *per annum,* until the said child *shall arrive at the age of seven years."*

Such is the law.    It has been decided that the *proceeding* under it is a *criminal* proceeding, so classed by the law itself, and made so by virtue of the *Title* to the old Act of 1781, ch. 13, which is "An Act directing proceedings against persons *guilty of Fornication;"* that the fact that the *design* of the law in inflicting punishment was *indemnity to the county,* does not in the least *change* the *character* of the *proceeding,* and hence as the security is given to the State "to accomplish *a purpose of public. convenience,* the insolvent laws do not reach it," and a discharge thereunder does not discharge the father from his obligation.    *Oldham vs. State, use of Crothers,* 5 *Gill,* 90 ; *State vs. Phelps,* 9 *Md.,* 21 ; *Owens vs. State,* 10 *Md.,* 164 ; *Bake vs. State,* 21 *Md.,* 422.    But though the *proceeding* is thus classified and called a *criminal* proceeding, all these authorities concede that the main purpose of the law, and the object the Legislature intended to accomplish by its enactment, was to secure in *certain cases,* and to a *limited extent,* indemnity to the county

against the support of illegitimate children; and that this was its object is clearly demonstrated by the provisions we have cited. It takes no notice of fornication as a crime, except where it results in the birth of a child. Only one of the parties is required to give the security. The mother may give it if she chooses and is able, and she may decline, or refuse to disclose the father, and in that event nothing is done with the latter. If she discloses the father she is discharged altogether. If she charges the wrong man, or if upon trial of the question of paternity he is acquitted, nothing further can be done with either party, and the admitted fornication is passed by without further notice. In that case the tax-payers must take the chance of having the support of the child cast upon them as in case of other pauper children.

It is conceded that at the time this statute was enacted it was within the power of the Legislature to pass such a law. Does, then, the fourteenth amendment annul it, or prevent its enforcement? The provisions relied on as having this effect are those parts of the second clause of that amendment which declare that " no State shall make or enforce any law which shall abridge the *privileges* or *immunities* of citizens of the United States; nor deny to any person within its jurisdiction the *equal protection of the laws.*" It was decided in the *Slaughter-House Cases,* 16 *Wallace,* 36, that the first clause of this amendment was primarily intended to confer citizenship on the negro race, that the second protects from the hostile legislation of the States the privileges and immunities of citizens of the United States, as distinguished from the privileges and immunities of citizens of the State, and that the paragraph which forbids a State to deny to any person the equal protection of the laws was clearly intended to prevent hostile discrimination against the negro race. And in the more recent case of *Pace vs. Alabama,* 106 *U. S.,* 583, it was held that the purpose of this last clause was to prevent

hostile and discriminating State legislation against any person or class of persons; that equality of protection under the laws implies not only accessibility by each one, whatever his race, on the same terms with others to the Courts of the country for the security of his person and property, but that in the administration of criminal justice he shall not be subjected, for the same offence, to any greater or different punishment; yet it was decided in that case that a statute of Alabama, prohibiting a white person and a negro from living with each other in adultery or fornication, is not in conflict with this clause, although it prescribes penalties more severe than those to which the parties would be subject were they of the same race and color.

Now, if we are right in our views as to the construction and effect of this Bastardy Law, we are unable to perceive how it conflicts with either of these clauses as thus interpreted by the Supreme Court. Clearly the procreation of illegitimate children cannot be said to be a *privilege* or *immunity* of citizens of the United States, nor does the statute give any privilege or confer any benefit upon the *mothers* of such children. It is true the mother may receive the $30 per year paid by the father, but not because she is the mother of the child, but because the child is maintained by her. It is given to her simply as compensation for such maintenance. If the child is not maintained by the mother, or if she does not have the child in her custody for maintenance, she gets nothing, and the money goes to "some other person to whose custody such child may have been committed to be maintained." Again, as between *fathers*, whether white or colored, no distinction whatever is made, and how can the fact that the law does not extend to *negro or colored mothers* be regarded as a denial to them of the "equal protection of the laws," as these terms have been defined by the authorities cited. It surely will not be contended that there is discrimination

Plunkard *vs.* State.

*against them* because they are not embraced in the terms
of a penal statute or of such a law as this. Nor do we
perceive how the white mother can be said to be discrimi-
nated against by a law, all the burthens of which she can
escape by her own voluntary act of simply disclosing the
father of her child, whether he be white or colored. Upon
this point, as well as upon the construction of the statute
generally, we adopt the following views, stated in the
brief of the Attorney-General, as having been expressed
by Judge SYESTER in a case in his circuit, in which the
validity of this law was controverted: "The statute,"
says the learned Judge, " aims at no redress for private or
personal wrongs done to the *mother*. The act intended to
be punished involves no invasion of the mother's rights ;
no element of trespass or violence ; she is a consenting
party. It is not a case where she would otherwise be
left exposed without the protection of the law to trespasses,
assaults or violence ; hence the argument that the colored
mother is exposed when the white mother is protected,
and that redress is extended to the one and denied to the
other, is really without foundation. No personal right is
invaded ; no privilege or immunity of the white or colored
mother is interfered with. Still more unfounded is the
suggestion that the child itself is protected in the one
case, and left exposed in the other. No such result is con-
templated by the statute, and nothing of the kind follows
as an incident of its enforcement. The security required
is not for the benefit of the child ; it is intended only to
protect the public from the maintenance of the child, and
if that indemnity is not given it is a mistake to suppose
that the child is left without nurture, maintenance or sup-
port. The county or public is charged with its mainte-
nance, and unless the indemnity contemplated by the
statute is given, the burden of maintaining the child,
whether the illegitimate offspring of a white or colored
mother, still rests upon the public. If the child is not left

to perish under the law, as the argument assumes, the burden of its support is only shifted and placed on the father as a measure of punishment upon him, and this punishment falls equally without respect to race or color."

There are other grounds upon which the affirmance of this judgment could well be rested, but we have deemed it best to affirm.it upon the sole ground that in our opinion the law, as it stands, is constitutional and valid, and therefore can be enforced.

*Judgment affirmed.*

(Decided 22nd June, 1887.)

STONE, J., filed the following dissenting opinion :

If the fourteenth amendment to the Constitution of the United States means anything, it means that there shall not be in any State one law applying to the white race and another and different one applying to the black; more especially does this apply to criminal laws.

The Bastardy Law of Maryland, a very old law, by its terms applies exclusively to the whites, and is, in my opinion, in direct controversion of that amendment.

My first impression was that the only effect of the amendment was to strike out the word "white" from the law, and leave it otherwise intact, applying to white and black equally.

But that law is in fact a criminal law, and such laws will not be extended by implication. The passage of the amendment will not extend a criminal law to embrace a class or race not before embraced in its terms. The whole law must therefore fall.

(Filed 22nd June, 1887.)